IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

RENEA N. GARDNER,              )
                               )
       Plaintiff,              )
                               )
vs.                            )          Case No. 2:14-cv-1430-TMP
                               )
CAROLYN W. COLVIN,             )
Commissioner of Social Security, )
                               )
       Defendant.              )
                               )

**MEMORANDUM OPINION**

**I.   Introduction**

      The plaintiff, Renea N. Gardner, appeals from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for a period of disability and Disability Insurance Benefits ("DIB"). Ms. Gardner timely pursued and exhausted her administrative remedies, and the decision of the Commissioner is ripe for review pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3). The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 626(c).

Ms. Gardner was 50 years old at the time of the Administrative Law Judge's ("ALJ's") decision, and she has a high school education. (Tr. at 22).[1] Her past work experiences are as a customer service manager, a delivery driver and auto parts clerk, a floral designer, and a leasing consultant. (*Id*.) Ms. Gardner claims that she became disabled on October 1, 2010, due to inflammatory arthritis; osteoarthritis of the lumbar spine and bilateral knees; major depressive disorder; generalized anxiety disorder; panic disorder; obesity; and chronic and severe pain. (Tr. at 16).

When evaluating the disability of individuals over the age of eighteen, the regulations prescribe a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920; *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). The first step requires a determination of whether the claimant is "doing substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If she is, the claimant is not disabled and the evaluation stops. *Id*. If she is not, the Commissioner next considers the effect of all of the physical and mental impairments combined. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). These impairments must be severe and must meet the durational requirements before a claimant will be found to be disabled. *Id*. The decision depends upon the medical

---

[1] Claimant was 47 years old at her alleged onset date, 49 when the hearing was held before the ALJ, and she turned 50 two days before the ALJ's decision was entered.

2

evidence in the record. *See Hart v. Finch*, 440 F.2d 1340, 1341 (5th Cir. 1971). If the claimant's impairments are not severe, the analysis stops. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Otherwise, the analysis continues to step three, which is a determination of whether the claimant's impairments meet or equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant's impairments fall within this category, she will be found disabled without further consideration. *Id.* If she does not, a determination of the claimant's residual functional capacity ("RFC") will be made and the analysis proceeds to the fourth step. 20 C.F.R. §§ 404.1520(e), 416.920(e). Residual functional capacity is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite her impairments. 20 C.F.R. § 404.1545(a).

The fourth step requires a determination of whether the claimant's impairments prevent him or her from returning to past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant can still do his or her past relevant work, the claimant is not disabled and the evaluation stops. *Id.* If the claimant cannot do past relevant work, then the analysis proceeds to the fifth step. *Id.* Step five requires the court to consider the claimant's RFC, as well as the

claimant's age, education, and past work experience, in order to determine if he or she can do other work.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the claimant can do other work, the claimant is not disabled.  *Id.*  The burden of demonstrating that other jobs exist which the claimant can perform is on the Commissioner; and, once that burden is met, the claimant must prove his or her inability to perform those jobs in order to be found to be disabled.  *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).

Applying the sequential evaluation process, the ALJ found that Ms. Gardner has not been under a disability within the meaning of the Social Security Act from the date of onset through the date of his decision.  (Tr. at 23-24).  He determined that Ms. Gardner has not engaged in substantial gainful activity since the alleged onset of her disability. (Tr. at 16).  According to the ALJ, Ms. Gardner's inflammatory arthritis, osteoarthritis of the lumbar spine and bilateral knees, obesity, major depressive disorder, generalized anxiety disorder, and panic disorder are considered "severe" based on the requirements set forth in the regulations.  (Tr. at 16-17).  He further determined that these impairments neither meet nor medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 17).  The ALJ found Ms. Gardner's testimony at the hearing and statements

4

in the record to be "less than entirely credible" with respect to the debilitating effects of these conditions.  (Tr. at 21).  He determined that the plaintiff has the residual functional capacity to perform light work with the following limitations:  that she can never climb ladders, ropes, or scaffolds, and should only occasionally stoop, kneel, crouch, crawl, balance, and climb ramps or stairs.  He determined, in addition, that she should avoid concentrated exposure to extreme temperatures, operational control of moving machinery, and unprotected heights.  He further limited her work to the performance of simple, routine, and repetitive tasks, in a work environment where changes occur on only an occasional basis, and where there is no greater than occasional, brief, and superficial interaction with coworkers, supervisors, or the public.   (Tr. at 18).

According to the ALJ, Ms. Gardner is unable to perform any of her past relevant work, she was a "younger individual" at the date of alleged onset but had since aged into the category known as "closely approaching advanced age."  (Tr. at 22).  The ALJ further noted that Ms. Gardner has a high school education and is able to communicate in English, as those terms are defined by the regulations.  (Tr. at 22).  He determined that "transferability of skills is not material to the determination of disability" in this case.  (Tr. at 22-23).  The ALJ found that Ms.

5

Gardner has the residual functional capacity to perform a significant range of light work. (Tr. at 23). Even though Plaintiff cannot perform the full range of light work, the ALJ found that there are a significant number of jobs in the national economy that she is capable of performing, such as sorter, mail sorter, and machine tender (plastics). (Tr. at 23). The ALJ concluded his findings by stating that Plaintiff is "not disabled" under the Social Security Act. (Tr. at 23-24).

## II. Standard of Review

This court's role in reviewing claims brought under the Social Security Act is a narrow one. The scope of its review is limited to determining (1) whether there is substantial evidence in the record as a whole to support the findings of the Commissioner, and (2) whether the correct legal standards were applied. *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). The court approaches the factual findings of the Commissioner with deference, but applies close scrutiny to the legal conclusions. *See Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). The court may not decide facts, weigh evidence, or substitute its judgment for that of the Commissioner. *Id.* "The substantial evidence standard permits administrative decision makers to act with considerable latitude, and 'the possibility of drawing two inconsistent

conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Parker v. Bowen*, 793 F.2d 1177, 1181 (11th Cir. 1986) (Gibson, J., dissenting) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)).  Indeed, even if this Court finds that the evidence preponderates against the Commissioner's decision, the court must affirm if the decision is supported by substantial evidence.  *Miles*, 84 F.3d at 1400.  Substantial evidence is more than a scintilla, but less than a preponderance.  No decision is automatic, however, for "despite this deferential standard [for review of claims] it is imperative that the Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987).  Moreover, failure to apply the correct legal standards is grounds for reversal.  *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

### III.    Discussion

Ms. Gardner alleges that the ALJ's decision should be reversed and remanded because, she argues, the ALJ failed to give proper weight to the opinions of her treating physicians.  (Doc. 9, p. 8).  Plaintiff contends that the ALJ failed to properly weigh the opinion of Dr. Eudy, the claimant's treating rheumatologist, who opined that Ms. Gardner would be unable to work an 8-hour day, would be in

significant pain that would make her unable to stay on task, and therefore was not employable. (*Id.*)  Counsel further asserts that the opinion of Dr. Jones, the claimant's treating psychiatrist, that Ms. Gardner had several "marked" and "extreme" impairments performing in a work environment that render her unable to sustain employment.  (Doc. 9, p. 10).   The Commissioner has responded that the opinions of Drs. Eudy and Jones were properly assessed as being inconsistent with other evidence in the record, including their own treatment records.  (Doc. 10, pp. 7-17).

Under prevailing law, a treating physician's testimony is entitled to "substantial or considerable weight unless 'good cause' is shown to the contrary." *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1159 (11th Cir. 1997) (internal quotations omitted).  The weight to be afforded a medical opinion regarding the nature and severity of a claimant's impairments depends, among other things, upon the examining and treating relationship the medical source had with the claimant, the evidence the medical source presents to support the opinion, how consistent the opinion is with the record as a whole, and the specialty of the medical source.  *See* 20 C.F.R. §§ 404.1527(d), 416.927(d).  "Good cause" exists for an ALJ not to give a treating physician's opinion substantial weight when the

"(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) . . . was conclusory or inconsistent with the doctor's own medical records."  *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004) citing *Lewis*, 125 F.3d at 1440; *see also Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991) (holding that "good cause" exists where the opinion was contradicted by other notations in the physician's own record).

Opinions such as whether a claimant is disabled, the claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner;" thus the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner."  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  The court instead looks to the doctors' evaluations of the claimant's condition and the medical consequences thereof, not their opinions of the legal consequences of his [or her] condition."  *Lewis*, 125 F.3d at 1440.  *See also* 20 C.F.R. § 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."). Such statements by a physician are relevant to the ALJ's findings, but they are not

determinative, because it is the ALJ who bears the responsibility of assessing a claimant's residual functional capacity.  *See, e.g.*, 20 C.F.R. § 404.1546(c).

The court reviews the ALJ's consideration of the opinions of the treating physicians in turn.  Dr. Eudy is a rheumatologist who began treating Ms. Gardner as early as May of 2007, and through the time after she applied for DIB benefits.  Dr. Eudy diagnosed Ms. Gardner with osteoarthritis of the lumbar spine and both knees, as well as inflammatory arthritis.  In the Physical Capacities Evaluation he completed on September 9, 2011, he determined that Ms. Gardner was able to sit no more than 5 hours during an 8-hour work day, and could stand no more than 2 hours of a workday.  (Tr. at 316).  Thus, by his calculation, she was incapable of working an entire 8-hour day.  He further opined that her pain level was "intractable and virtually incapacitating."  (Tr. at 317).  His treatment notes, which were virtually ignored by the ALJ, frequently assess her pain as "persistent" and "ongoing" with "intermittent" swelling.  (*See, e.g.*, Tr. at 322, 330).  While the ALJ stated that Dr. Eudy saw "no signs or symptoms to suggest active lupus or autoimmune disease" (tr. at 18), his notes indicate that she had positive ANA results that suggest Sjogren's Syndrome, which is an autoimmune disease.  (Tr. at 330).  The positive ANA and probably Sjogren's Syndrome was also noted by Dr. Reddy, the claimant's treating

internist.  (Tr. at 339).  Dr. Eudy's physical examinations consistently showed that she had tenderness in her fingers, toes, knees, hips, and elbows.  (Tr. at 323, 331, 346, 475).  Dr. Eudy's treatment notes are generally consistent with those of Dr. Reddy, with the objective medical records, and with the claimant's own testimony.

The ALJ found Dr. Eudy's assessment of the plaintiff was "not credible," and stated that it was "inconsistent with the claimant's treatment records," and that "conservative treatment generally appeared to control her symptoms when she was compliant."  (Tr. at 19).  He thus found that Ms. Gardner's condition was "generally stable" and gave Dr. Eudy's opinion "little weight."   The court is unable to reconcile the ALJ's assessment with Dr. Eudy's records and the records of her internist.  He consistently found that the plaintiff had pain and tenderness associated with osteoarthritis, and that she got only partial relief from her medications.  The only medication she was "noncompliant" with was a Vitamin D supplement, and no evidence in the record suggests that the vitamin would have alleviated her pain.  While she reported that she did not start the Plaquenil as soon as it was prescribed in 2009, she clearly began taking it thereafter, and she was apparently continued taking it, although she "ran out" in 2010, and told Dr. Reddy that she needed to see Dr. Eudy about getting more.  (Tr. at 229, 369).  The ALJ's

description of the plaintiff's treatment as "conservative" seems to be the ALJ's own medical opinion, as nowhere in the record does any medical authority suggest that there are more aggressive treatments that would or could be employed to treat Ms. Gardner's impairments.[2]  There is no question that she has been diagnosed as positive for anti-nuclear antibodies (ANA+), a clear sign of rheumatic autoimmune diseases,[3] and probably with Sjogren's syndrome.[4] (Tr. at 346).  Although Dr. Eudy sometimes described her osteoarthritis as "stable," (tr. at 226), he also sometimes noted that her spine and knees were "worse" (tr. at 228), or that, while stable, the pain was "chronic."  (Tr. at 230).  Standard treatment options for

---

[2]  The plaintiff was taking NSAIDs and narcotic pain medications to treat the osteoarthritis.  She was prescribed Plaquenil to slow or prevent joint damage due to rheumatic diseases, *see* http://www.drugs.com/plaquenil.html (July 24, 2015), and Colcrys to treat painful gout.   http://www.drugs.com/colcrys.html (July 24, 2015).

[3]  Rheumatic disease is also known as connective tissue disease.  *See generally* http://rheumatology.oxfordjournals.org/content/39/6/581.full (July 24, 2015). "ANAs occur in patients with a variety of autoimmune diseases, both systemic and organ-specific. They are particularly common in the systemic rheumatic diseases, which include lupus erythematosus (LE), discoid LE, drug-induced LE, mixed connective tissue disease, Sjogren syndrome, scleroderma (systemic sclerosis), CREST (calcinosis, Raynaud's phenomenon, esophageal dysmotility, sclerodactyly, telangiectasia) syndrome, polymyositis/dermatomyositis, and rheumatoid arthritis." http://www.mayomedicallaboratories.com/test-catalog/Clinical+and+Interpretive/9026 (July 24, 2015).

[4]  Sjogren's syndrome is an autoimmune disease in which a person's white blood cells attack the moisture-producing glands of the body.  It is a debilitating disease often accompanied by other auto-immune disorders, such as rheumatoid arthritis, lupus, and scleroderma.  *See* http://www.sjogrens.org/home/about-sjogrens-syndrome (July 24, 2015).

rheumatoid arthritis include physical therapy and medications, such as Plaquenil,[5] to slow or prevent joint damage, which was prescribed for plaintiff by Dr. Eudy. There simply is no evidence in the record to indicate that how Dr. Eudy treated plaintiff is "conservative," or that there are more aggressive treatments for pain were available.  Surgery becomes a treatment option only for severely damaged joints, but debilitating pain in the joints long precedes the need for surgical repair.  The issue in this case is whether Dr. Eudy's opinion that plaintiff's *pain* prevented her from working a full 8-hour day is inconsistent with his own medical treatment of her, and that simply is not the case.  The assertion that plaintiff received only "conservative" treatment is not an adequate reason for disregarding the treating physician's opinions about the degree of disability plaintiff suffered because there is nothing inconsistent between type of treatment Dr. Eudy provided and the opinions he expressed.

---

[5] "There is no cure for rheumatoid arthritis. Medications can reduce inflammation in your joints in order to relieve pain and prevent or slow joint damage. Occupational and physical therapy can teach you how to protect your joints. If your joints are severely damaged by rheumatoid arthritis, surgery may be necessary." http://www.mayoclinic.org/diseases-conditions/rheumatoid-arthritis/basics/treatment/con-20014868 (July 24, 2015).

Plaintiff next asserts that the ALJ erred in giving little weight to the opinion of Dr. Rebecca Jones, a psychiatrist, who treated Ms. Gardner in 2011 and 2012. Dr. Jones noted that Ms. Gardner had major depressive disorder, severe, with psychotic features, and panic disorder. (Tr. at 276). Dr. Jones also noted that Ms. Gardner complained of aggression and grief, and that even "high dose SSRI therapy has not helped" quell the aggression plaintiff displayed toward others.[6] (Tr. at 273). Dr. Jones further noted that the claimant reported that her family told her she was "crazy," and that she has hallucinations of her brother and father, both of whom are deceased. (Tr. at 276-77). The treatment notes of Dr. Jones further demonstrate trouble sleeping, recurrent nightmares, feeling guilty, experiencing crying spells, and having little energy. (Tr. at 440-44). Dr. Jones prescribed psychiatric medications including Paxil, Wellbutrin, Abilify, Ambien, Trazodone, and Adderall. Dr. Jones opined in August 2011 that the plaintiff had "marked" difficulty in maintaining social functioning, "marked" deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner; "marked" impairment of ability to respond to customary work pressures, "marked" limitations

---

[6] Plaintiff's aggression was severe enough to cause her to be terminated from her last job. Clearly, psychological problems leading to that level of aggression have a marked impact on her ability "to respond to customary work pressures" or "to respond appropriately to supervision in a work setting," yet this was disregarded by the ALJ.

14

in understanding, carrying out, or remembering instructions in a work setting, "extreme" impairment in the ability to respond appropriately to supervision in a work setting, and "extreme" impairment in responding appropriately to coworkers, along with "marked" impairment in performing simple tasks in a work setting and in performing repetitive tasks in a work setting.  (Tr. at 313-14).  Dr. Jones's notes are internally consistent, consistent with the other medical records, and supported by the claimant's own testimony.  The ALJ essentially discounts Dr. Jones's assessment in favor of that of a state agency psychologist, who never examined or treated the plaintiff.  (Tr. at 309-11).

      The ALJ's failure to give adequate reasons for virtually ignoring the opinions of Dr. Eudy and Dr. Jones, two physicians who treated plaintiff over an extended period, compels the conclusion that the matter is due to be remanded for further consideration by the ALJ.  There appears to be no "good cause" to give less than substantial weight to their opinions.  The combined debilitating effects of plaintiff's psychological problems, rheumatic diseases, osteoarthritis, obesity, and diabetes appear to be grossly understated by the ALJ in a way that is not supported by substantial evidence in the record, particularly when proper weight is accorded to the opinions of the plaintiff's treating physicians.

## IV.  Conclusion

Upon review of the administrative record, and considering all of Ms. Gardner's arguments, the undersigned Magistrate Judge finds the Commissioner's decision is not supported by substantial evidence and is not in accord with the applicable law; therefore, the Commissioner's denial of benefits is VACATED and this matter is REMANDED for further consideration in light of this Memorandum Opinion.

DATED the 24th day of July, 2015.

_____
T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE